UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JULIAN AIRES**<br><br>**Defendant.** | Case No. 24-cr-<br><br>VIOLATIONS:<br> **Count 1**: 18 U.S.C. § 371<br><br>18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (Criminal Forfeiture) |

### INFORMATION

The United States charges that:

### GENERAL ALLEGATIONS

At all relevant times, unless otherwise stated:

#### *Relevant Statutory Background*

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1 *et seq*. (the "FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of influencing the foreign official, inducing the foreign official to take or omit certain acts, and securing an improper advantage in order to assist those classes of persons in obtaining or retaining business for, or directing business to, any person.

#### *Relevant Individuals and Entities*

2.      Defendant **JULIAN AIRES** was a United States citizen who resided in San Diego, California. **AIRES** was a principal of Company 2 and Company 3 (defined below). **AIRES** was

1

also a "domestic concern" and an officer of a "domestic concern," as that term is defined in the FCPA, Title 15, Section 78dd-2(h)(1)(A) and (B). In connection with the Company 1 scheme described herein, **AIRES** also acted as an agent of Company 1 (defined below) and was thus an "agent" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

3.  "Company 1," an entity whose identity is known to the United States and the defendant, was an aviation services company based in the United States. Company 1 was traded on the New York Stock Exchange and required to file reports with the U.S. Securities and Exchange Commission. Company 1 was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.  "Company 1 Subsidiary," an entity whose identity is known to the United States and the defendant, was a wholly-owned subsidiary of Company 1 based in the United States.

5.  "Company 2," an entity whose identity is known to the United States and the defendant, was an aircraft component services company based in the United States. Company 2 was a "domestic concern" as that term is defined in the FCPA, Title 15, Section 78dd-2(h)(1)(B).

6.  "Company 3," an entity whose identity is known to the United States and the defendant, was an aircraft component services company based in South Africa affiliated with Company 2 and controlled by **JULIAN AIRES** and Individual 3 (defined below).

7.  "Company 4," an entity whose identity is known to the United States and the defendant, was the South African subsidiary of an airport services company based in Switzerland.

8.  South African Airways ("SAA") was the state-owned flag carrier airline of South Africa. SAA was controlled by and performed government functions for and on behalf of South

Africa. SAA was an "instrumentality" of the South African government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1.

9. South African Airways Technical ("SAAT") was a wholly-owned subsidiary of SAA that provided technical services for SAA and other airlines. SAAT was controlled by and performed government functions for and on behalf of South Africa. SAAT was an "instrumentality" of the South African government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1.

10. "Individual 1," an individual whose identity is known to the United States and the defendant, was a United Kingdom citizen and resident. Individual 1 was an executive employed by a U.S.-based subsidiary of Company 1 from approximately 2015 through 2019. Individual 1 was thus an "agent" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

11. "Individual 2," an individual whose identity is known to the United States and the defendant, was a United States citizen and resident. Individual 2 was an executive of Company 1 between approximately 2010 and 2019. Individual 2 was thus an "officer" and "employee" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

12. "Individual 3," an individual whose identity is known to the United States and the defendant, was a South African citizen, a director of Company 3, and a part-owner of Company 4.

13. "Individual 4," an individual whose identity is known to the United States and the defendant, was a South African citizen and a director of Company 3. Individual 4 was a close relative of Individual 3.

14. "Foreign Official 1," an individual whose identity is known to the United States and the defendant, was a citizen of South Africa who served as an official at SAAT from

approximately 2014 through 2018. Foreign Official 1 was a "foreign official" as the term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

15. "Foreign Official 2," an individual whose identity is known to the United States and the defendant, was a citizen of South Africa who served as a high-level official of SAA and SAAT from approximately 2009 through in or around August 2016. Foreign Official 2 was a "foreign official" as the term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

16. "Foreign Official 3," an individual whose identity is known to the United States and the defendant, was a citizen of South Africa who served as a high-level official of SAA and SAAT between approximately 2010 through in or around August 2017. Foreign Official 3 was a "foreign official" as the term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

## CONSPIRACY TO VIOLATE THE FOREIGN CORRUPT PRACTICES ACT
**(18 U.S.C. § 371)**

Beginning in or around January 2016, through in or around at least January 2020, in the United States, and elsewhere, the defendant,

**JULIAN AIRES,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with others known and unknown to the United States to commit an offense against the United States, that is:

(a) being an agent of an issuer, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly and in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official and to a person, while knowing

4

that all or part of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Company 1 in obtaining and retaining business for and with, and directing business to, defendant **JULIAN AIRES**, Company 1, Company 3, and others, in violation of Title 15, United States Code, Section 78dd-1 and 78ff(c)(2)(A);

(b) being a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official and to a person, while knowing that all or part of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order assist defendant **JULIAN AIRES** and others in obtaining and retaining business for and with, and directing business to, defendant **JULIAN AIRES**, Company 1, Company 3, and others, in violation of Title 15, United States Code, Section 78dd-2(a); and

(c) being a United States person, to willfully and corruptly make an offer, payment, promise

to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official and to a person, while knowing that all or part of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order assist defendant **JULIAN AIRES** and others in obtaining and retaining business for and with, and directing business to, Company 3, Company 4, and others, in violation of Title 15, United States Code, Section 78dd-2(i).

## PURPOSE OF THE CONSPIRACY

17. It was the purpose of the conspiracy for **JULIAN AIRES** and his co-conspirators to unlawfully enrich themselves and others by bribing South African officials in order to obtain and retain business with SAAT for (a) Company 1, Company 3, and others ("Company 1 Scheme") and (b) Company 3, Company 4, and others ("Company 4 Scheme").

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which **JULIAN AIRES** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

18. The co-conspirators discussed in person and through electronic communications their plan and agreement to make bribe payments to South African officials to obtain and retain business from SAAT.

19. The co-conspirators discussed in person and through electronic communications how they would pay the bribes on behalf of Company 1 and Company 3, including via wire transfers and cash payments to Individual 3 in South Africa.

20. The co-conspirators used bank accounts in the United States and South Africa to conduct wire transfers and withdraw cash to be used as bribe payments to South African officials.

21. The co-conspirators attempted to disguise the bribe payments on behalf of Company 1 and Company 3 as legitimate business transactions by referring to them as "consulting fees" and by using code names for the South African officials.

22. The co-conspirators used a false service contract involving Company 4 to obtain funds to be used as bribes to South African officials for the benefit of Company 3 and Company 4.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish the purposes and objects thereof, **JULIAN AIRES** and his co-conspirators committed and caused to be committed, in the United States and elsewhere, at least one of the following overt acts, among others:

A. Company 1 Scheme

23. In or around January 2016, **JULIAN AIRES** attended a meeting in South Africa with Individual 3, Individual 4, and Foreign Official 1, during which it was discussed and agreed that Foreign Official 1 and two others—Foreign Official 2 and Foreign Official 3—were to receive a share of the revenue from the SAAT Contract.

24. On or about January 14, 2016, Individual 4 sent an email to the personal email account of Foreign Official 1 attaching a draft of Company 1 Subsidiary and Company 3's proposal

to SAAT for the SAAT Contract, stating, "Hi cuz! So here is the latest proposal. Please let me know if it is acceptable?"

25. Also on or about January 14, 2016, Individual 4 sent an email to the personal email account of Foreign Official 1, attaching a draft of the joint venture agreement between Company 3 and Company 1 Subsidiary, noting that Company 3 was "to receive 5% of any amounts received by [Company 1] from SAAT. . . . This is linked to revenue not profits. . . . We need to determine what will 5% of revenue equate to as a percentage ownership of the Joint Venture for [Company 3]. Please let me know if there is anything else we might have overlooked?"

26. On or about January 18, 2016, the same day Company 1 Subsidiary and Company 3 entered into a joint venture agreement (the "JV Agreement") and together submitted a bid to SAAT for the SAAT Contract, Individual 1 sent an email to **JULIAN AIRES**, Individual 2, Individual 3, and Individual 4 confirming agreement to the addition of a success fee for Company 3 from Company 1 equaling "1.5% of the total bid value" and "payable to [Company 3] within first year of commencement of service with SAAT." Individual 1's email also stated, "In recognition of the fact, [Company 3] would have incurred cost during the bidding and contract process," [Company 1] "will make one time advance payment . . . equal to the first month's commission . . . ."

27. On or about August 2, 2016, **JULIAN AIRES** sent an email, while in the United States, to Individual 1 and Individual 2, copying Individual 3 and Individual 4, regarding "[Company 3]: Invoice – Success Fee," and stating "Below is our invoice for assisting [Company 1 Subsidiary] to procure the [SAAT Contract]. Please wire transfer the funds as per bank details stated on the invoice." The invoice attached to the email was for a $250,000 success fee to be paid to a Company 2 bank account in the United States.

8

28. On or about October 23, 2016, after winning and beginning to perform on the SAAT Contract, Individual 1 sent an email to Individual 2 regarding a potential price increase on the SAAT Contract to cover a requested fee increase for Company 3, stating, "The way to do this will be for them (SAAT) to request to us asking for change to the [fleet requirements]. It will also look very authentic in terms of why rates went up. . . . I want to be absolute sure from [Company 3] that this is possible before I say anything to" Individual 1's supervisor.

29. On or about November 20, 2016, a Company 2 employee in the United States ("Company 2 Employee") sent an email to **JULIAN AIRES**, attaching a spreadsheet containing a breakdown of anticipated income and expenses for Company 3 on the SAAT Contract. In a section labeled "Payments Total for 5 Years," the spreadsheet listed anticipated payments totaling $662,200 each to **JULIAN AIRES**, Individual 3, Foreign Official 1, Foreign Official 2, and Foreign Official 3 (with the foreign officials listed by code names).

30. On or about November 14, 2017, a day after Company 3's U.S. bank account received a payment from Company 1's U.S. bank account, Company 2 Employee sent an email to Individual 4, copying **JULIAN AIRES**, referencing "consulting fees" due to Individual 3, Foreign Official 1, Foreign Official 2, and Foreign Official 3 (with the foreign officials listed by code names). The email also stated, "Jules [**AIRES**] is going to bring $40,000 USD and I am transferring the remaining $21,908.04 to [Individual 3's] US bank account tomorrow."

31. On or about April 6, 2018, **JULIAN AIRES** sent an email to Company 2 Employee stating that **JULIAN AIRES** had told Individual 3 and Individual 4 that "in future can only pay 80 each x2 and 1x 140, as we had originally arranged last year with the group," referencing the bribe payments to Foreign Official 1, Foreign Official 2, and Foreign Official 3 in South African rand.

32. On or about September 1, 2018, **JULIAN AIRES** sent a text message to Individual 3 that stated, "I will send you $22,300. $6x 3 for Cuz [Foreign Official 1] $18,000 [M]ay [J]une [J]u[l]y plus $4300 for R80 [J]une [J]uly Sisi [Foreign Official 2]. Total $22300."

33. On or about January 9, 2020, Company 1 made a wire transfer of approximately $73,282 from its U.S. bank account to Company 3's South Africa bank account, representing five percent of a payment Company 1 received from SAAT on the SAAT Contract.

B. Company 4 Scheme

34. In or around February 2016, **JULIAN AIRES** and others, acting at the direction of Individual 3, drafted a service agreement between Company 4 and Company 3, pursuant to which Company 3 was to provide services to Company 4 in relation to Company 4's provision of airport ground handling services to SAA. The service fee to be paid by Company 4 to Company 3 for these services was approximately 25,000,000 South African Rand (equivalent of approximately $1.7 million).

35. On or about March 23, 2016, after receiving a payment of approximately 28,500,000 South African Rand (equivalent of approximately $2 million) on or about the same date from Company 4, Company 3 made two transfers from its South Africa bank account totaling approximately 22,500,000 South African Rand (equivalent of approximately $1.6 million) to bank accounts in South Africa; these payments were in part for the benefit of SAA officials.

All in violation of Title 18, United States Code, Section 371.

**FORFEITURE**

**(18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c))**

36. The allegations contained in this Information are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **JULIAN AIRES**, has an interest.

37. Upon conviction of a conspiracy to commit a felony violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-1 et seq. and Title 18, United States Code, Section 371 as alleged in this Information, the defendant shall forfeit to the United States all property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C), which is made criminally applicable by Title 28, United States Code, Section 2461(c).

## MONEY JUDGMENT

38. Upon conviction, the United States may seek a money judgment.

## SUBSTITUTE ASSETS

39. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

                        MATTHEW M. GRAVES
                        UNITED STATES ATTORNEY
                        DISTRICT OF COLUMBIA


By:    /s/ Madhu Chugh
     MADHU CHUGH
     ASSISTANT UNITED STATES ATTORNEY
     DISTRICT OF COLUMBIA


     GLENN S. LEON, CHIEF
     CRIMINAL DIVISION, FRAUD SECTION
     U.S. DEPARTMENT OF JUSTICE

By:    /s/ Katherine Raut
     KATHERINE RAUT, TRIAL ATTORNEY
     ELINA RUBIN-SMITH, TRIAL ATTORNEY
     CRIMINAL DIVISION, FRAUD SECTION